UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| NORTHEASTERN CENTER INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:03-CV-246-TS |
| ) | |
| ST. PAUL FIRE AND MARINE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Northeastern Center Inc. insured with Defendant St. Paul Fire and Marine Insurance Company its downtown building in Kendallville, Indiana. While the policy was in effect, the fire inspector determined that the east wall of the building was substantially impaired, which led the authorities of Kendallville to order its evacuation. The Plaintiff restored the wall at significant expense and loss. The Plaintiff then submitted a proof of its losses to the Defendant for compensation but the Defendant refused payment, arguing that the losses were specifically excluded from coverage.

This disagreement landed the parties in this Court and culminated in a one day bench trial on the issue of whether the Defendant breached the insurance contract. The Court, having heard and determined the credibility of the witnesses and having considered the arguments of counsel and the applicable law, in accordance with Federal Rule of Civil Procedure 52(a), enters the following findings of fact and conclusions of law.

**FACTUAL FINDINGS**

1.  The Plaintiff, Northeastern Center, Inc., is a not-for-profit Indiana corporation that provides mental health services throughout Noble, DeKalb, LaGrange, and Steuben counties.

2.  From July 1, 2001, until July 1, 2002, the Defendant, St. Paul Fire and Marine Insurance Company, insured against property losses the Plaintiff's buildings, including the one at 220-226 South Main Street, in Kendallville, Indiana. The Plaintiff's premium for the insurance was $28,107.

3.  The insurance policy protected the covered property "against risks of direct physical loss or damage" except as indicated in policy exclusions. (Ins. Policy 2.) The following are the pertinent provisions:

    **Collapse.** We won't cover loss resulting from collapse unless due to any of the following causes of loss:
    . . . .
    •   Building glass breakage, falling objects, weight of ice, snow or sleet, water damage.
    •   Hidden Decay
    . . . .
    Collapse doesn't include settling, cracking, bulging, shrinking, or expansion.
    . . . .
    **Planning, design, materials, maintenance.** We won't cover loss caused by faulty, inadequate or defective:
    . . . .
    •   design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    •   materials used in repair, construction, renovation or remodeling; or
    •   maintenance.
    . . . .
    If a loss not otherwise excluded results, we'll pay for the resulting loss.
    . . . .
    **Settling – Smog**. We won't cover loss caused or made worse by:
    . . . .
    •   settling, cracking, bulging, shrinking or expansion of a . . . wall . . . .
    If a loss not otherwise excluded results, we'll pay for that resulting loss.
    . . . .
    **Wear – tear – deterioration – animals**. We won't cover loss caused or made worse by:

2

> - wear and tear;
> - deterioration, mold, wet or dry rot, rust, or corrosion;
> . . . .
> - the inherent nature of the property
>
> *Inherent nature* means a latent defect or any quality in the property that causes it to deteriorate or destroy itself.
>
> If a loss not otherwise excluded results, we'll pay for the resulting loss.

(*Id.* at 10–13.)

4. The Plaintiff's building at 220-226 South Main Street is a three-story brick structure built around 1909.

5. The east wall of the building is about 80 feet wide and 56 feet tall.

6. This wall, as well as other walls, were constructed with three wythes of solid clay brick for a total thickness of about 12 inches.

7. The outer wythe of the east wall and part of the south wall was a tan color face brick laid with reddish or terra cotta colored mortar. This wythe was constructed first, and substantially contributed to the structural integrity of the wall.

8. On the east wall, the two inner wythes of brick were tied together with a header row. A header row is composed of the brick perpendicular to its normal orientation and thus extending through both wythes and forming the tie. The two inner wythes are also called backer bricks.

9. The outer wythe was tied to the backer brick with S-shaped or Z-shaped wire ties with varied spacing. When the backer wythes were laid, excess mortar was forced from between the bricks where it flattened against outer the wythe. This excess mortar bonded to the outer wythe, helping attach it to the backer bricks.

10. The backer bricks were tied to the building structure at the second, third, and attic floor

levels with steel straps, with a shorter section of steel rod attached to the end.

11. On August 8, 2001, a fire safety inspector determined that the exterior wythe on the east wall was separating in some areas from the backer bricks between the second and the third floor windows. The separation resulted in bowing between the top and bottom of the windows.

12. The outer wythe bowed because the ties and mortar holding it to the backer bricks disintegrated. Numerous factors caused the ties and mortar to disintegrate when they did. The ties were old and not made of stainless steel or coated against corrosion. Also, the deterioration of the ties and mortar was accelerated by exposure to water, which entered the wall through various openings. Expansion of the bricks from moisture was not a substantial cause of the bowing. Most expansion would have taken place in the years immediately following the construction of the wall in 1909 and it was not until relatively recently that the wall bowed. To the extent expansion did exist and play a role in the bowing of the brick, it was not as much of a factor in causing the bowing as was the deterioration of the ties and bonding mortar.

13. The deterioration of the ties and the bonding mortar was hidden from view.

14. Following the discovery of the exterior wythe's separation from the backer bricks, the Plaintiff took temporary safety precautions.

15. No bricks or any part of the exterior wythe had fallen to the ground before the Plaintiff's contractors began repairing the east wall.

16. However, the separation of the outer wythe constituted a substantial impairment of the building's structural integrity, which led the City of Kendallville to order its evacuation. The engineers who assessed the building were afraid that the wall could crumble at any time and

cause the entire building to fall.

17. Parts of the building remained unoccupied for forty-four days, until the east wall could be reconstructed, thus interrupting the Plaintiff's business at the building.

18. By having to repair the wall and by having its business interrupted, the Plaintiff incurred expenses and suffered losses in the amount of $761,139.

19. On February 21, 2003, the Plaintiff submitted its expenses and losses to the Defendant and demanded compensation in accordance with the insurance policy.

20. The Defendant refused to pay on the policy, arguing that the losses were excluded from the coverage.

## CONCLUSIONS OF LAW

**A.   Issues to be Decided**

When the Plaintiff submitted its losses resulting from the reconstruction of the east wall of the building in Kendallville, the Defendant refused payment, arguing that the wall did not collapse, as that term was understood in the insurance policy. The Plaintiff relied on the contract provision stating that collapse caused by hidden decay is covered by the policy. The Court must first determine whether the wall collapsed, and second, whether the collapse was caused by hidden decay or by a cause the policy excludes from coverage.

**B.   Interpretation of an Insurance Policy**

In Indiana, "if insurance is promised in general terms followed by specific exclusions or

limitations, the insurance company bears the burden of proving the applicability of the exclusion." *Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 892–93 (7th Cir. 1996). The contract between the parties is such a policy, *see* Ins. Policy 2 ("We'll protect covered property against risks of direct physical loss or damage except as indicated in the Exclusions–Losses We Won't Cover section."), and the burden is on the Defendant to show that the Plaintiff's claims fall within the exceptions.

"The provisions of an insurance contract are subject to the same rules of construction as other contracts." *Microvote Corp. v. GRE Ins. Group*, 779 N.E.2d 94, 96 (Ind. Ct. App. 2002). Accordingly, the court must interpret a contract so as to ascertain the intent of the parties at the time of the agreement. *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 603 (Ind. 1990). "It must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting." *Id.*

In an insurance contract, a provision that is clear and unambiguous "should be given its plain and ordinary meaning." *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind. 1992). "If there is an ambiguity, the policy should be interpreted most favorably to the insured." *Id.* "[T]he failure to define a term within an insurance policy does not necessarily render that term ambiguous." *Estate of Sullivan v. Allstate Ins. Co.*, 2006 WL 306511, *2 (Ind. Ct. App. February 10, 2006). "[A] contract provision is ambiguous if it is susceptible to more than one interpretation and reasonable persons would differ as to its meaning." *Progressive Ins. Co., Inc. v. Bullock*, 841 N.E.2d 238, 245 (Ind. Ct. App. 2006).

## C.   The Meaning of "Collapse"

The Plaintiff argues that its building's wall "collapsed" within the meaning of the word used

in the policy, when it became substantially impaired as a result of hidden decay or water damage. The Plaintiff urges the Court to interpret the word "collapse" in the likes of the modern trend, which "defines 'collapse' as a 'substantial impairment of the structural integrity of the building or any part of a building." *Monro Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 973 (Ind. 2005). Therefore, the Plaintiff believes its losses should be covered under the policy's provision concerning collapse, which states, "[w]e won't cover loss resulting from collapse unless due to . . . water damage [or] hidden decay." (Ins. Policy 10.)

The Defendant, on the other hand, insists that no such collapse took place because no part of the wall fell in, flattened, or otherwise changed its appearance usually associated with an ordinary meaning of the word "collapse." The Defendant asks the Court to interpret "collapse" in its traditional sense as an event of sudden occurrence resulting in complete disintegration. *Cf. Magwerks Corp.*, 829 N.E.2d at 972. Moreover, the Defendant maintains that the policy itself states that bulging does not constitute a collapse. In the alternative, the Defendant maintains that, even if the Court were to find that the wall collapsed, it owes no money to the Plaintiff because any such collapse was caused by reasons excluded from coverage, including: defects in material, design, and workmanship; settling, cracking, bulging, shrinking, or expansion of a wall; wear and tear; and deterioration or corrosion.

"In this case we sit in diversity, and therefore we are required to apply the substantive law of the forum state, Indiana. In fulfilling the mandate of *Erie*, we must apply the law of the state as we believe the highest court of the state would apply it." *Wolverine Mut. Ins. v. Vance ex rel. Tinsley*, 325 F.3d 939, 942 (7th Cir. 2003). The Indiana Supreme Court in *Magwerks* decisively answered the question of how collapse is to be defined in insurance contracts such as this. It held

7

that Indiana follows the modern view, in which "collapse" in insurance contracts is interpreted so that any substantial impairment of a building constitutes collapse. *Magwerks Corp.*, 829 N.E.2d at 973. In endorsing this view, the opinion cited with approval several cases finding collapse to exist, even though no part of the building fell. *Id.* (citing *Ercolani v. Excelsior Ins. Co.*, 830 F.2d 31, 34 (3d Cir. 1987) (holding that a bulging and cracking foundation wall constituted collapse because it substantially impaired the building); *Breakers v. Highlands Underwriters Ins. Co.*, 665 So. 2d 1084, 1085 (Fla. Dist. Ct. App. 1995) (Cope, J., concurring) (stating that the modern view does not require any part of a building to actually fall for there to be a collapse)). Also, some of the cases cited involve policies such as this one, where coverage is included for collapse but excluded for "settling, cracking, bulging, shrinking, or expansion," and collapse was found even though the building was substantially impaired by settling, cracking, bulging, shrinking, or expansion. *Id.* (citing *Beach v. Middlesex Mut. Assurance Co.*, 532 A.2d 1297, 1300 (Conn. 1987) (holding that collapse coverage did not include settling or cracking unless substantial impairment of structural integrity of building ensued); *Nationwide Mut. Fire Ins. Co. v. Tomlin*, 352 S.E.2d 612, 615 (Ga. Ct. App. 1986) (holding that cracking caused by a settling foundation constituted a collapse because it seriously impaired the building)).

*Magwerks* requires the application of the modern interpretation of "collapse" in insurance policies for buildings in Indiana. According to this modern interpretation, even if no part of the building fell, and the building's impairment seems better characterized as a bulge than a collapse, there is coverage for collapse so long as the building is substantially impaired. The preponderance of the evidence shows that the Plaintiff's Kendalville building was substantially impaired by the bowed wall, and thus it was collapsed within the meaning of the policy.

**D.     The Cause of the Collapse**

Having found the bowed wall constituted a collapse, the Court must determine whether the collapse was caused by hidden decay or water damage or by one of the causes excluded from coverage. The ultimate burden is on the Defendant to show that the Plaintiff's claim falls within one of the exclusions. The Court, in its fact finding role, found the cause of the bowing of the wall to be the failure of the ties and mortar, which had held the outer wythe to the backer bricks. The deterioration of the ties and mortar was caused by the presence of water between the outer wythe and the backer bricks, old age, and the fact that the ties were not protected from corrosion. Expansion of the bricks did not play a major role in causing the outer wythe to separate and bow.

The Court finds that because the policy covers collapse caused by "hidden decay" or "water damage," the policy covers the collapse at issue here. Webster's Dictionary defines "decay" as:

> **1 a :** the condition of a person or thing that has undergone a decline in strength, soundness, or prosperity or has been diminished in degree of excellence or perfection . . . **b :** a progressive failure of strength, soundness or prosperity **:** a diminishing in degree of excellence or perfection . . . **2 a :** the material process of dilapidation **:** wasting or wearing away **:** the state of being wasted or worn away **:** RUIN . . . **5 a :** ROT **:** the aerobic decomposition of proteins chiefly by bacteria in which the products of putrefaction are completely oxidized to stable compounds having no foul odors

*Webster's Third New Int'l Dictionary* 584 (1993). The corrosion and deterioration of the ties and mortar holding the outer brick wythe to the backer bricks is accurately described as a progressive failure in strength and soundness, or as a wasting and wearing away. "Decay" is not ordinarily understood to mean only "rot." Thus, the cause of the collapse was decay, and because that decay was hidden, the collapse is covered. Also, the infiltration of water behind the outer wythe was a major cause of the decay, and so water damage can also be said to have helped cause the collapse.

9

Therefore, the policy covers the damaged Kendalville building.

The Defendant argues that a collapse is covered by the policy only if the original cause that set off the chain of events leading to collapse is covered and is not listed as an exclusion. Because the original causes that began the chain of events were listed as exclusions (deterioration, corrosion, and defective design or workmanship), and hidden decay is an effect of these original causes, the Defendant argues the policy does not cover the repair of the bowed outer wythe.

The Court disagrees with the Defendant's interpretation of the policy. Corrosion, deterioration, and decay are synonymous. They do not describe different events in the causal chain that led to the collapse. Also, the coverage for hidden decay and the exclusion for corrosion and deterioration are not in conflict. In interpreting the contract, the Court attempts to harmonize its terms rather than choose an interpretation that results in conflict. Harmonizing the exclusion for corrosion and deterioration with the coverage for collapse caused by hidden decay is not difficult. Decay, corrosion, and deterioration are not covered unless the decay is hidden and causes collapse. Here, the decay was hidden and caused collapse, so the exclusion for corrosion and deterioration does not apply.

The decay was caused, at least partially, by defects in the building that left the ties holding the outer wythe to the backer bricks susceptible to corrosion and rust. The policy excludes coverage for loss caused by faulty materials. However, the ties here lasted from 1909 when the building was built until the walls began bowing around 2001. The Defendant has not carried its burden in showing the materials or designs used were faulty when considered in relation to the time in which the building was built, or that a building can be considered defective when it lasted 90 years before structural repairs were necessary. Also, the policy is ambiguous as to whether a loss is covered when

10

faulty designs and defects lead to hidden decay, causing a collapse. A reasonable person could read the policy and conclude that any collapse caused by hidden decay is covered, even if that decay is caused by an excluded factor, such as faulty design. In the Court's view, it is more reasonable to interpret the contract to find coverage for any decay, regardless of cause, when that decay was hidden and caused collapse. Also, the ambiguity is to be interpreted in favor of the insured, and so the Court finds that the loss does not fall within the exclusion for faulty materials and design.

### E.     Damage Amount

The Defendant has not contested the amount of the Plaintiff's expenses to restore the wall or its losses caused by the interruption to its business at the Kendallville building. The Plaintiff submitted a proof of loss in the amount of $761,139 with prejudgment interest beginning to accrue on March 23, 2003.

Plaintiff is entitled to prejudgment interest because its damages for breach of contract are ascertainable. *See Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind. Ct. App. 2002) ("The test for determining whether an award of prejudgment interest is appropriate is whether the damages are complete and may be ascertained as of a particular time."). When the parties do not agree on the interest rate, the rate of prejudgment interest according to Indiana statute is 8% per annum until payment of judgment. Ind. Code 24-4.6-1-102. Applying the Indiana Statute, the Court calculates prejudgment interest is owed in the amount of $183,674.31.

### CONCLUSION

For the reasons stated above, the Court awards the Plaintiff $ 761,139 and $ 183,674.31 in

prejudgment interest.

      SO ORDERED on March 28, 2006.


      <u>    s/ Theresa L. Springmann         </u>
      THERESA L. SPRINGMANN
      UNITED STATES DISTRICT COURT